**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MICHELLE DANIELS, et al.,

     Plaintiffs,

v.           CIVIL ACTION NO.   2:22-cv-00247

MINGO COUNTY COMMISSION, et al.,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Joshua McCown's Motion for Summary Judgment. (ECF No. 113.)   For the reasons more fully explained below, the motion is **GRANTED** in part and **DENIED** in part.   Also pending is Defendants Charlotte Lane, Renee Larrick, and William Raney's Motion for Summary Judgment.   (ECF No. 116.)   That motion is **GRANTED**.

*I.  BACKGROUND*

This matter arises from an officer-involved shooting in Mingo County, West Virginia. Defendants Charlotte Lane, Renee Larrick, and William Raney ("WVPSC Defendants") are all West Virginia Public Service Commissioners.   (ECF No. 56 at 6–7, ¶ ¶ 29–31.)   Defendant Joshua McCown ("Defendant McCown") is a police officer employed by the West Virginia Public Service Commission ("WVPSC").   (ECF No. 131 at 134:1–9.)   His typical job duties entail enforcing state and federal laws and regulations governing commercial motor vehicles.   (*Id.*)

1

However, he sometimes responds to requests for assistance from other law enforcement agencies. (*Id.* at 136:24–137:6.)

In the early evening hours of January 4, 2022, the Kentucky State Police ("KSP") notified Mingo County law enforcement of a police pursuit headed their way.   (ECF No. 131 at 154:17–23.)   KSP advised that two individuals had stolen a flatbed truck and were considered armed and dangerous.   (*Id.* at 155:2–24, 161:12–15.)   Defendant McCown was working in Mingo County that day, so he set out to assist.   (*Id.* at 157:22–24.)   He first traveled to the Beech Creek area, where he and several officers from the Mingo County Sherriff's Department ("MCSD") discussed the situation.   (*Id.* at 160:1–14.)

Around this time, MCSD Deputy Blake Sipple ("Sipple") spotted the two suspects near Matewan and radioed their location to the other officers.   (ECF No. 131 at 269:23–270:15, 273:1–6.)   Sipple managed to detain one suspect, Lloyd McGee, but the other suspect, 29-year-old Robert Lee Daniels, Jr. ("Decedent"), fled on foot.   (*Id.* at 270:19–271:11, 273:5–8.)   Sipple chased Decedent through the woods for a while and finally found him hidden under a thick patch of kudzu.   (*Id.* at 273:16–274:3.)   Sipple ordered Decedent to come out, and Decedent complied. (*Id.* at 274:9–12.)   However, rather than doing so slowly, Decedent jumped up, hands in the air, "kind of balled into a fist but not really."   (*Id.*)   So Sipple tased him.   (*Id.* at 274:15.)   However, Decedent wore a thick Carhartt coat that shielded him from the taser.   (*Id.* at 274:16–24.) Decedent managed to escape Sipple, swim across a nearby creek, and remain on the lam.   (*Id.* at 275:5–10.)

Not long after, Decedent's parents, Robert Daniels, Sr. ("Robert"), and Michelle Daniels ("Michelle") (collectively "the Daniels"), were driving along Route 49, a two-lane highway in

Mingo County.   (*See, e.g.*, ECF No. 129 at 532:8–13.)   They were headed to Robert's brother Earl's nearby home,[1] hoping Earl could fix some mechanical issues on their dilapidated Chrysler van.   (*Id.* at 531:11–21.)   On the way, Robert and Michelle saw Decedent walking along the roadside.   (ECF No. 129 at 532:8–13.)   The couple stopped the van and told Decedent to hop in, and he gladly obliged.   (*Id.* at 339:14–18.)   Decedent complained that he was "cold and wet," (*id.* at 535:1–2), and he also told Robert how "he [had] got in a lot of trouble" that day, (*id.* at 340:5–8.).   Robert told Decedent that he was "going to take him home, get him something to eat, get him some dry clothes, and [then Decedent would go] turn hisself (sic) in."   (*Id.* at 340:2–4.)   But the trio continued to Earl's home, where Earl worked on the van.   (*See id.* at 396:15–397:11.)   Thirty minutes later, they left Earl's and headed home.   (*Id.* at 395:14–17.)   Robert drove, Decedent sat in the front passenger seat, and Michelle rode in the backseat.   (*See id.* at 342:15–344:19, 477:6–7.)

By this time, officers had got wind that Decedent was likely with his parents, and they had also gotten a description of the van.   (ECF No. 131 at 182:24–183:16.)   Then, sometime between 7:00 and 7:15 p.m., MCSD Deputy J.D. Tincher ("Tincher") passed the van on Route 49 as the Daniels family was driving home from Earl's.   (ECF No. 114-1 at 4; ECF No. 131 at 370:8–371:20.)   Tincher realized that the van matched the reported description, and he immediately turned around, "kicked [on his] lights," and radioed his location to other officers.   (ECF No. 131 at 371:21–372:9.)   Defendant McCown was only one mile or so away, so he headed to Tincher's location.   (*Id.* at 184:14–185:2.)   Traveling from the opposite direction, Defendant McCown arrived at the scene just as the van was coming to a stop.   (*Id.* at 188:2–6.)   He parked his WVPSC

---

[1] Robert lived about two miles from Earl.   (ECF No. 129 at 334:15–17.)

vehicle in his lane, midway between Tincher's MCSD cruiser and the van, both of which sat in the opposite lane.   (*Id.* at 188:10–24; *see also* ECF No. 114-1 at 45.)

The parties dispute what exactly happened next, but the following is Plaintiffs' recitation. Tincher exited his cruiser first.   (ECF No. 129 at 344:9.)   He jumped out, drew his pistol, and rushed the passenger side.   (*Id.*; ECF No. 131 at 192:19–21.)   Defendant McCown exited his SUV seconds later, approached the van's driver side, and ordered Robert to place his hands on the steering wheel.   (ECF No. 129 at 446:13–447:1.)   As Defendant McCown watched Robert, Tincher yanked the front passenger door open and yelled at Decedent to exit the van.   (*Id.* at 344:9–10.)   However, before Decedent had the chance to comply, three gunshots rang out— Tincher shot an unarmed Decedent three times.[2]   (*Id.* at 344:12–16; ECF No. 131 at 203:24– 204:1.)   Robert then jumped from the van's driver seat to the passenger seat and landed on top of Decedent, hoping to protect him from Tincher.   (ECF No. 129 at 344:18–21.)   That effort proved futile, though, because Defendant McCown and Sipple (who had arrived moments before) picked up Robert and moved him off of Decedent.   (*Id.* at 350:17–351:7.)   As this scene unfolded, and Decedent choked on his own blood, no officer checked his vitals, provided first aid, or performed CPR.   (*Id.* at 569:12–16.)   Officers instead called for an EMS, which arrived 13 minutes later.[3] (ECF No. 114-1 at 10.)   Decedent died at the scene.   (*Id.*)

---

[2] The first round entered Decedent's right wrist, passed through his right lower abdomen, and fragmented in his pelvis and abdomen.   (ECF No. 114-1 at 99.)   The second and third rounds hit Decedent's chest.   (*Id.*)
[3] The Court notes that Robert testified in his deposition that it took two hours for the EMS to arrive.   (ECF No. 129 at 369:2–6.)   However, this lone speculative statement is insufficient for a reasonable jury to find that it took that long, given that Defendant McCown has produced detailed police records showing (1) when the request for the EMS was made, (2) when the EMS dispatched, and (3) when the EMS arrived at the scene.   (ECF No. 114-1 at 10.)   *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Officers were not yet finished with Robert and Michelle.   Defendant McCown and Sipple carried Robert to the middle of the road and slammed him face-down on the blacktop.   (ECF No. 129 at 354:5–12.)   Robert, still in shock at his son being shot, yelled "You son of a bitches shot my boy!"   (*Id.* at 352:5–6.)   Defendant McCown responded by striking him in the face with his pistol, and Sipple stomped his foot before handcuffing him.   (*Id.* at 357:3–358:1.)   Michelle, meanwhile, remained in the van and watched this scene unfold.   (*Id.* at 561:12–562:10.)   David Stratton, a member of the Matewan Police Department ("MPD"), soon ordered Michelle to exit the van, and she did so.   (*Id.* at 562:18–20.)   Michelle then laid down on the blacktop next to Robert and, she too, was handcuffed.   (*Id.* at 566:14–16.)   Five or ten minutes later the two were put into police vehicles: Robert was placed in Stratton's SUV, and Michelle was put in a City of Williamson cruiser.   (*Id.* at 365:6–11, 566:6–10.)

The Daniels' problems were far from over.   Robert and Michelle were next taken to Matewan City Hall, where they were *Mirandized*[4] and interviewed by West Virginia State Police Sergeant Cory Maynard and MCSD officers Allen Mounts and Roger Fitch.   (ECF No. 114-1 at 14.)   After their interviews were finished, Robert and Michelle were hauled to jail and charged as accessories after the fact, in violation of West Virginia Code § 61-11-6.   (ECF No. 114-8; ECF No. 129 at 383:4–8.)   Sipple filed the criminal complaint against the couple, and he listed himself, Tincher, and Defendant McCown as complainants.   (ECF No. 114-8 at 2.)   However, despite naming Tincher and Defendant McCown as fellow complainants, the record shows that Sipple was the only officer to prepare, sign, and submit the criminal complaint.   (*See, e.g.*, ECF No. 114-10 at 6:8–7:20.)   The charges were ultimately dropped, though, because Robert and Michelle could

---

[4] *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

not have committed the charged offense, as West Virginia Code § 61-11-6 specifically excludes parents from the class of persons capable of being accessories after the fact.   (*See* ECF No. 114-9 at 5.)

This lawsuit followed.   On June 1, 2022, Robert and Michelle filed suit in their personal capacities, and Michelle also filed suit as the Representative of Decedent's Estate, and on behalf of C.D., Decedent's minor son (collectively "Plaintiffs").   (ECF No. 1 at 3, ¶ ¶ 4–6.)   They initially sued the Mingo County Commission, MCSD Sherriff Joe Smith, 18 MCSD deputies, the City of Matewan, West Virginia, Matewan's Mayor Matt Moore, 4 MPD officers, and Matewan Fire Department Chief Gibson, with the individuals being sued in both their individual and official capacities.   (*Id.* at 3–7, ¶ ¶ 7–34.)   Plaintiffs then amended their complaint to dismiss certain defendants and also add new ones, including the WVPSC, the WVPSC Defendants, and Defendant McCown, again suing the individual defendants in their individual and personal capacities.   (ECF No. 56 at 6–7, ¶ ¶ 28–32.)   Plaintiffs later dismissed the WVPSC as a party, and they also dismissed the claims brought against the WVPSC Defendants in their official capacities.   (ECF No. 73.)   The eight-count Amended Complaint alleged a litany of claims against Defendant McCown and the WVPSC Defendants, which, for simplicity's sake, are discussed more fully below.   (*Id.* at 10–19, ¶ ¶ 42–80.)

The parties have since completed discovery, and Defendant McCown and the WVPSC Defendants filed their respective motions for summary judgment on August 21, 2023.   (ECF Nos. 113, 116.)   Plaintiffs submitted joint responses to each motion on September 5, 2023, (ECF Nos. 126, 127), to which Defendant McCown and the WVPSC Defendants replied on September 11, 2023, (ECF No. 135, 136).   These matters are now ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. In pertinent part, this rule states that a court should grant summary judgment if "there is no genuine issue as to any material fact."   Summary judgment should not be granted, however, if there are factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When evaluating these factual issues, the Court must view the evidence "in the light most favorable to the opposing party."   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ."   *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   "This burden may be met by use of the depositions and other discovery materials."   *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).   Once the moving party meets its burden, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Should a party fail to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."   *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a

genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

## III.    DISCUSSION

As noted above, Plaintiffs' Amended Complaint brought a slew of claims against Defendant McCown.   However, these claims have since been pared down significantly by recent developments.   First, in Plaintiffs' joint response to Defendant McCown's motion, Robert indicated that he withdrew his claims against Defendant McCown for assault, battery, excessive force, Fourteenth Amendment violations, and invasion of privacy.   (ECF No. 127 at 33.)   He now intends to pursue those claims in his "forthcoming 42 U.S.C. § 1983/14th Amendment lawsuit." (*Id.*)   Second, and also in Plaintiffs' joint response to Defendant McCown's motion, Plaintiffs failed to respond to Defendant McCown's arguments in favor of summary judgment on several of their other claims.   (*See id.*)   Plaintiffs have thus abandoned those claims.   *Blankenship v. Necco, LLC*, No. 2:16-cv-12082, 2018 WL 3581092, at *9 (S.D. W. Va. July 25, 2018) ("The failure to respond to arguments raised in a motion for summary judgment can indicate that the non-moving party concedes the point or abandons the claim."); *see also Fields v. King*, 576 F. Supp. 3d 392, 408 (S.D. W. Va. 2021)   In light of these recent developments, only six claims now remain against Defendant McCown: (1) failure to provide medical care to Decedent in violation of the Fourteenth Amendment (Count II); (2) illegal seizure of Michelle in violation of the Fourth Amendment (Count IV);[5] (3) intentional infliction of emotional distress/tort of outrage (Count

---

[5]  The Fourth and Fourteenth Amendment claims are, of course, brought by way of 42 U.S.C. § 1983.

VI(e)); (4) negligent infliction of emotional distress (Count VII(f)); (5) bystander liability (Count V); and (6) civil conspiracy (VI(h)).[6]

Plaintiffs also brought several claims against the WVPSC Defendants.  (*See* ECF No. 56 at 16–17, ¶ ¶ 69–74.)   But, just as Plaintiffs abandoned many of their claims against Defendant McCown, they have also abandoned many claims against the WVPSC Defendants.   (ECF No. 126 at 4.)   As it currently stands, then, only the following three claims remain against the WVPSC Defendants: (1) vicarious liability (Count VIII); (2) negligent training (Count VII(b)); and (3) negligent supervision (Count VII(d)).

Plaintiffs' vicarious liability claim against the WVPSC Defendants hinges in large part on whether Defendant McCown committed any wrongful act within the scope of his employment as a WVPSC officer.   *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 767 (W. Va. 2014).   Because of this, the Court first addresses Defendant McCown's motion.   Once complete, the Court then takes up the WVPSC Defendants' motion.

A.  Defendant McCown

The Court begins with Count II.   There, Plaintiffs bring a Fourteenth Amendment claim against Defendant McCown, alleging that he failed to provide Decedent with emergency medical care and therefore violated his right to due process of law.   (ECF No. 56 at 11–12, ¶ ¶ 46–53.)

The Fourteenth Amendment's Due Process Clause guarantees that pretrial detainees receive adequate medical care while in government custody.   *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988).   However, this affirmative duty does not arise until the government has

---

[6] The Court notes that Plaintiffs concede Defendant McCown cannot be held liable for using excessive force against Decedent.   (ECF No. 127 at 25.)   However, the Court is puzzled by the exact nature of this concession: Plaintiffs surrender their excessive force claim on qualified immunity grounds, despite Defendant McCown never raising that defense.   (*Id.*; ECF No. 114 at 13–14.)

restrained the detainee's liberty such that a custodial relationship exists between the two. *Compare Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("As a general matter, a State is under no constitutional duty to provide substantive [medical] services [to] those within its border."), *with DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, *medical care*, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process Clause." (emphasis added)).   The Fourth Circuit has explained that a "custodial relationship," for Fourteenth Amendment purposes, requires "[s]ome sort of confinement," such as "incarceration, institutionalization, or the like."   *Pinder v. Johnson*, 54 F.3d 1169,1174–75 (4th Cir. 1995) (en banc).

Here, no reasonable jury could find that Defendant McCown restricted Decedent's personal liberty to point that he formed a custodial relationship with Decedent.   This conclusion flows, as it must, from the undisputed fact that Defendant McCown never interacted with Decedent. Indeed, during the entirety of the traffic stop, Defendant McCown was focused on securing Robert; Tincher was instead the only officer that ever interacted with Decedent.   To be sure, Tincher did shoot and kill Decedent, and that act no doubt triggered an affirmative duty to provide Decedent with medical care.   *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).   However, Tincher was the only officer that curtailed Decedent's liberty, so he alone had the affirmative duty to provide medical care.

That said, even if the Court were to find that Defendant McCown had an affirmative duty to provide Decedent with medical care, Plaintiffs' claim would still fail because that duty is not as

10

demanding as they believe.   Specifically, Plaintiffs fault Defendant McCown for "not even attempt[ing] to implement any semblance of first aid" to Decedent as he succumbed to his wounds. (ECF No. 127 at 33.)   Except no court has ever required officers to provide first aid to fugitives injured during apprehension.   *See, e.g.*, *Price v. County of San Diego*, 990 F. Supp. 1230, 1242 (S.D. Cal. 1998).   Instead, as far as this Court can tell, Defendant McCown simply needed to call for emergency medical personnel.   *City of Revere*, 463 U.S. at 244–45 ; *Wilson v. Meeks*, 52 F.3d 1547, 1555–56 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001); *Tagstrom v. Enockson*, 857 F.2d 502, 504 (8th Cir. 1988); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986).   The record here shows that officers summoned emergency personnel within minutes of shots being fired.   (ECF No. 114-1 at 10.)   Plaintiffs have thus failed to show that Defendant McCown failed to carry out any constitutional command, and the Court hereby **GRANTS** summary judgment to Defendant on Count II.

       ii.    Fourth Amendment

The Court next turns to Count IV, wherein Plaintiffs purport to bring a Fourth Amendment claim against Defendant McCown.   Count IV of the Amended Complaint alleges that "Tincher, Sipple, Justice, and possibly other members of [the] MCSD" violated Michelle's Fourth Amendment rights by illegally seizing her.   (ECF No. 56 at 13, ¶ 59.)   She now argues—for the first time—that this claim extends to Defendant McCown, and that she has a viable Fourth Amendment claim against him.   (ECF No. 127 at 25–28.)   The Federal Rules say otherwise.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief."   This requirement exists "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"

*Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   In other words, each claim must contain enough "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Count IV does no such thing.   Count IV mentions Defendant McCown neither by name nor affiliation (he is a member of the WVPSC, not MCSD), so Count IV never set forth a cognizable claim against him.   To be sure, the evidence developed during discovery does show that Defendant McCown was at the scene and did briefly detain Michelle.   Count IV, however, does not allege a Fourth Amendment claim against him for that.   Plaintiffs have failed to bring a Fourth Amendment claim against Defendant McCown, and, to the extent Plaintiffs now claim that they have, the Court **GRANTS** summary judgment to Defendant McCown.[9]

> iii.   Intentional Infliction of Emotional Distress/Tort of Outrage

Turning now to Plaintiffs' claim for the intentional infliction of emotional distress, the Court finds summary judgment inappropriate because a reasonable jury could find that Defendant McCown behaved outrageously.

Under West Virginia law, plaintiffs seeking to prevail on a claim for the intentional infliction of emotional distress must prove the following four elements:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the

---

[9] Even if Plaintiffs had properly sued Defendant McCown, their claim would still fail.   First, the initial stop and detainment were both proper under Fourth Circuit law.   *United States v. Holmes*, 376 F.3d 270, 276 (4th Cir. 2004) (approving a felony stop where all vehicle occupants where frisked, handcuffed, and placed in locked patrol cars while officers searched the suspect's vehicle).   Second, there is no record evidence—let alone enough to survive summary judgment—that Defendant McCown played any role in arresting and charging Michelle.   In fact, their own expert concedes as much.   (ECF No. 136-8 at 64:20–65:5.)

actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419 (W. Va. 1998).  "In order for the 'outrageous' standard to be met, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"  *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 78 (4th Cir. 2016) (quoting *Harless v. First Nat'l Bank in Fairmont*, 289 S.E.2d 692, 705 (W. Va. 1982)).  "The conduct must be more than 'merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, [] negligent. . . . [or] overzealous.'"  *Id.* (alterations in original) (quoting *Hines v. Hills Dep't Stores, Inc.*, 454 S.E.2d 385, 391 (W. Va. 1994)).  "[I]t must truly offend community notions of acceptable conduct."  *Travis*, 504 S.E.2d at 425 (quoting *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988)).

Defendant McCown here urges the Court to grant him summary judgment because, in his view, he did not behave outrageously.[10]  (ECF No. 114 at 17–19.)  The facts refute this.  For example, after Tincher inexplicably shot Decedent and Robert rushed to his aid, Defendant McCown dragged Robert away from his dying son.  Adding insult to injury, and as Robert expressed his dismay at his son being shot, Defendant McCown slammed him face-down on the blacktop and pistol-whipped him—all while his son choked on his own blood and drew his last breath.  A jury could easily find that these acts transcended all bounds of decency and were thus

---

[10] Defendant McCown also argues in passing that Plaintiffs cannot satisfy *Travis*' fourth element.  (ECF No. 114 at 17.)  However, Defendant McCown offers no analysis or explanation of why that is so.  The Court thus rejects this conclusory statement and will instead allow a jury to decide the matter.

"atrocious and utterly intolerable in a civilized community."  *Kerr*, 824 F.3d at 78.  For these reasons, the Court **DENIES** Defendant McCown's motion for summary judgment on Count VI(e).

> iv.     Negligent Infliction of Emotional Distress

Plaintiffs' claim for the negligent infliction of emotional distress, however, must be dismissed.  West Virginia law allows "[a] defendant [to] be held liable for negligently causing a plaintiff to experience serious emotional distress[] after the plaintiff witnesses a person closely related to the plaintiff suffer critical injury or death as a result of the defendant's negligent conduct."  Syl. Pt. 1, in part, *Heldreth v. Marrs*, 425 S.E.2d 157 (W. Va. 1992).  This test "is premised upon the traditional negligence test of foreseeability."  *Id.* at 169.  In other words, the plaintiff must prove that "his or her serious emotional distress was reasonably foreseeable, that *the defendant's negligent conduct caused the victim to suffer critical injury or death*, and that the plaintiff suffered serious emotional distress as a direct result of witnessing the victim's critical injury or death."  *Id.* (emphasis added).

Here, Plaintiffs' claim must fail for two independent reasons.  First, they concede that Defendant McCown "did not cause [Decedent's] injuries (i.e., the brutal shooting death of [Decedent])."  (ECF No. 127 at 30.)  That concession is fatal to their claim—Defendant McCown cannot be held liable for causing Robert and Michelle's emotional distress without first having caused the underlying injury that triggered their distress.  *Heldreth*, 425 S.E.2d at 169.  Second, and even more fundamentally, Plaintiffs have not identified any negligent conduct on Defendant McCown's part.  They posit that Defendant McCown was negligent by not better coordinating with Tincher and synchronizing a unified plan before initiating the traffic stop.[11]  (ECF No. 127

---

[11] Plaintiffs alternatively argue that Defendant McCown somehow acted negligently because "he was improperly trained to perform [the felony] stop."  (ECF No. 127 at 30.)  Unfortunately, they rely on *ipse dixit* reasoning—rather

at 30–31.)   However, Plaintiffs cite no legal authority for this proposition.   This is unsurprising,

though, because West Virginia law does "not require[]" officers "to guarantee, ensure or otherwise

take extraordinary caution to make certain that their actions will be accomplished safely."

*Honaker v. Mahon*, 552 S.E.2d 788, 793 (W. Va. 2001) (internal quotation marks omitted).   This

Court shall not be the first to require officers to pause their pursuit of a fleeing fugitive to devise

an airtight game plan before seizing the suspect.   Because of that, the Court **GRANTS** summary

judgment to Defendant McCown as to Count VII(f).

     v.     Bystander Liability

Next, in Count V, Plaintiffs believe they have viable a § 1983 "bystander liability" claim

against Defendant McCown.   The Court disagrees.

     Count V, after incorporating and realleging each preceding paragraph, states in its entirety:

> 67.    Plaintiffs Robert Lee Daniels, Sr., and Michelle Daniels were within Defendant Tincher's line of fire when he fatally shot their son, Robert Lee Daniels, Jr. They both witnessed Robert Lee Daniels, Jr., suffer from the deadly gunshot wounds to his body. As one may expect when parents witness the senseless and brutal death of their son, Robert Lee Daniels, Sr., and Michelle Daniels were traumatized and in great shock. Both Robert Lee Daniels, Sr., and Michelle Daniels were in the vehicle with Robert Lee Daniels, Jr., as he choked on his own blood and drew his last breath on the vehicle floorboard. Robert Lee Daniels, Sr., and Michelle Daniels have suffered tremendous direct personal injury in the form of mental anguish and severe emotional distress.

> 68.    As a direct and proximate result of the fatal shooting of their son in their presence, Robert Lee Daniels, Sr., and Michelle Daniels seek compensation as set forth more fully and specifically below in the Damages section of this Complaint.

> (ECF No. 56 at 15–16, ¶¶ 66–68.)

---

than record evidence—to show that Defendant McCown was negligently trained.   Even if true, Defendant McCown's being negligently trained does not show that he himself acted negligently; it would only speak to whether his employer acted negligently in improperly training him.

This claim fails for multiple reasons.   First, Count V is anything but a § 1983 bystander liability claim.   Count V never mentions § 1983, nor does it mention the basic elements such a claim.   *See Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002) ("[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.").   The Court has already explained that Rule 8(a)(2) requires "a short and plain statement of the claim," and Count V comes nowhere close to articulating a plausible § 1983 bystander liability claim.   The Court instead believes that Count V raised a second claim for the negligent infliction of emotional distress.   Indeed, Count V's allegations carefully track the elements of that claim: Tincher shot and killed Decedent in front of his parents, which caused them to suffer "mental anguish and severe emotional distress."   (ECF No. 56 at 15–16, ¶ 67.)   The Court recognizes that Count V is thus duplicative of Count VII(f), but that is irrelevant here because Plaintiffs filed four other redundant, duplicative claims that added nothing new to the case.[12]   So instead of stating a bystander claim under § 1983, Count V simply parrots the elements of a meritless tort claim.

Second, even if Count V did state a § 1983 claim, Defendant McCown was not named as a defendant as to that count.   A quick skim (or a fine-tooth parsing for that matter) shows that Count V names just one wrongdoer: Tincher.   Defendant McCown is not mentioned in Paragraphs 67 or 68, so Count V never stated a claim against him.   *See* Fed. R. Civ. P. 8(a)(2).   Plaintiffs

---

[12] These duplicative claims include: (1) a § 1983 wrongful death claim (Count III) and a § 1983 excessive force claim (Count I) (the alleged excessive forced caused Decedent's wrongful death, so the wrongful death claim necessarily encompasses the excessive force claim); (2) an unwelcome touching claim (Count VI(b)) and a civil battery claim (Count VI(c)); (3) a claim for "atrocious and outrageous conduct," (Count VI(f)) which seemingly mirrors the claim for intentional infliction of emotional distress/tort of outrage (Count VI(e)); and (4) "common law negligence," (Count VI(i)) despite also suing for "negligence" (Count VII(g)).

cannot now claim that they sued Defendant McCown in Count V without running afoul of the Federal Rules of Civil Procedure.

All that aside, even if Plaintiffs had followed the Federal Rules of Civil Procedure and properly sued Defendant McCown for bystander liability under § 1983, they would still lose. Under Fourth Circuit law, a bystander officer can only be held liable for his partner's actions when he (1) is confronted with an illegal act, (2) is able to stop the illegal act, and (3) chooses not to act. *Stanton v. Elliott*, 25 F.4th 227, 237 (4th Cir. 2022).   Here, assuming Tincher did violate Decedent's rights by shooting him, Robert, Michelle, and their expert all concede that Defendant McCown lacked the opportunity to prevent the harm.[13]   (ECF No. 114-10 at 32:14–18; ECF No. 129 at 451:8–12, 611:9–17.)   Given these concessions, the Court is convinced that no reasonable jury could find for Plaintiffs on this claim, and Defendant McCown is thus entitled to judgment as a matter of law.   The Court therefore **GRANTS** summary judgment to Defendant McCown as to Count V.

      vi.    Civil Conspiracy

Summary judgment is also warranted on Plaintiffs' civil conspiracy claim.   "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means."   Syl Pt. 8, in part, *Dunn v. Rockwell*, 689 S.E.2d 255 (W. Va. 2009).   "At its most fundamental level, a 'civil conspiracy' is 'a combination to commit a tort.'"   *Id.* at 268 (quoting *State ex rel. Myers v. Wood*, 175 S.E.2d 637, 645 (W. Va. 1970)).   Importantly, "[a] civil conspiracy is not a standalone cause

---

[13] In their response, Plaintiffs argue—also for the first time—that Defendant McCown also should have prevented Sipple from charging them with being accessories after the fact.   (ECF No. 127 at 31–32.)   The Court declines to entertain this theory of bystander liability because Count V mentions neither Sipple nor his improper charging of Robert and Michelle, thereby failing to put Defendant McCown on notice of that theory of liability.

of action." *Hood v. Farmer*, No. 2:22-cv-00265, 2023 WL 1971343, at *10 (S.D. W. Va. Feb. 13, 2023).   "[I]t is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Dunn*, 689 S.E.2d at 269.   So, "[i]n addition to properly [showing] an underlying tort, a plaintiff proceeding on a civil conspiracy claim must [produce] sufficient factual support for the existence of a shared conspiratorial objective and mutual agreement." *Hood*, 2023 WL 1971343, at *10 (citing *Jane Doe-1 v. Corp. of President of The Church of Jesus Christ of Latter-Day Saints*, 801 S.E.2d 443, 476 (W. Va. 2017)).   The "agreement need not be express but may be based upon evidence of a course of conduct from which the agreement to act in concert may be implied." *Jane Doe-1*, 801 S.E.2d at 477.

Plaintiffs contend that Defendant McCown, Tincher, and Sipple conspired to "arrest[] Plaintiffs for a crime for which they cannot be charged," a clear violation of their Fourth Amendment rights.   (ECF No. 127 at 32.)   Plaintiffs, however, have no evidence that Defendant McCown entered into an agreement, express or implied, to charge Plaintiffs with being accessories after the fact. In fact, their own expert conceded that Defendant McCown played *no role* in arresting or charging Plaintiffs.   (ECF No. 136-8 at 64:20–65:5.)   Faced with this concession, Plaintiffs once again fall back on their own speculation that Defendant McCown intended to deprive them of their rights.   But "[P]laintiff[s] cannot avoid summary judgment by . . . referenc[ing] . . . evidence that is . . . the object of pure speculation." *White v. Swift Transp. Co. of Ariz.*, 1:12-cv-20, 2013 WL 12108650, at *2 (N.D. W. Va. Mar. 15, 2013) (quoting *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 196 (4th Cir. 2006)).   At bottom, Plaintiffs have failed to

produce even a scintilla of evidence that Defendant McCown conspired to violate their rights, and the Court therefore **GRANTS** summary judgment to Defendant McCown as to Count VI(h).

B. PSC Defendants

Having now addressed Defendant McCown's motion for summary judgment, the Court turns to the WVPSC Defendants' motion.   As mentioned above, Plaintiffs seek to hold the WVPSC Defendants vicariously liable for Defendant McCown's actions, and they also bring direct claims against the WVPSC Defendants for negligent training and negligent supervision.   The Court addresses each in turn.

i.      Vicarious liability

Plaintiffs' vicarious liability claim is two-fold.   First, they contend that the WVPSC Defendants can be held to answer for Defendant McCown's conduct based on the doctrine of *respondeat superior*.   (See ECF No. 126 at 2–3.)   Second, Plaintiffs further contend that the WVPSC Defendants can also be held vicariously liable based on *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny.   (*Id.* at 3.)

The Court can easily dispense with these matters.   Plaintiffs' *respondeat superior* theory fails for one simple reason: *respondeat superior* works to hold employers liable for their employees' wrongful acts, yet Plaintiffs have dismissed Defendant McCown's employer—the WVPSC—from this suit.   (ECF No. 73.)   Plaintiffs' attempt to hold the WVPSC Defendants vicariously liable, who are at best Defendant McCown's superiors, rests on a faulty understanding of the doctrine, which finds no basis in West Virginia law.   As a result, Plaintiffs' *respondeat superior* claim fails as a matter of law.

Plaintiffs' *Monell* claim fails for a similar reason.   In *Monell*, the Supreme Court held that "that *local governmental bodies may be liable* under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of *the local government* resulting in a violation of the plaintiff's rights."   *Saltz v. City of Frederick*, 538 F. Supp. 3d 510, 553 (D. Md. 2021) (emphasis added) (citing *Monell*, 436 U.S. at 690–91.)   Here, Plaintiffs once again misunderstand their own claim—*Monell* only provides a cause of action against municipalities, not individual public officials.   *Quern v. Jordan*, 440 U.S. 332, 340 (1979) (reaffirming that *Monell*'s holding "was limited to local government units" (internal quotation marks omitted) (quoting *Monell*, 436 U.S. at 690 n.54)).   Because the WVPSC Defendants are flesh-and-blood human beings—not local bureaucracies created by statute— Plaintiffs' *Monell* claim against the WVPSC Defendants fails as a matter of law.   The Court **GRANTS** summary judgment to the WVPSC Defendants on Count VIII.

ii.   Negligent Training

Plaintiffs' negligent training claim fares no better.   Under West Virginia law, plaintiffs bringing a negligent training claim must show that the defendant failed to properly train their employee and, as a result, that failure proximately caused the plaintiff's injury.   *See Fortune v. City of Logan*, No. 2:20-cv-00339, 2021 WL 4554667, at *3 (S.D. W. Va. Oct. 5, 2021).   This claim is no different than any other state-law negligence claim.   *Cf. Woods v. Town of Danville*, 712 F. Supp. 2d 502, 515 (S.D. W. Va. 2010).   This means "the plaintiff must prove the defendant (1) owed him a duty, (2) breached that duty, and (3) that breach proximately caused his injuries." *Rogers v. Tarbox*, --- F. Supp. 3d ----, ----, 2023 WL 2842879, at *3 (S.D. W. Va. 2023).

Plaintiffs here identify two alleged deficiencies in Defendant McCown's training that, they believe, caused their injuries.   Plaintiffs first complain that Defendant McCown was not properly trained in "pulling over an alleged 'high-risk' suspect," such as Decedent.   (ECF No. 126 at 3–4.) Plaintiffs further complain that Defendant McCown was improperly trained in interpreting West Virginia criminal statutes, and they claim that this shortcoming led to Robert and Michelle's improper arrest.   (*Id.* at 4.)

These arguments go nowhere.   For starters, Plaintiffs cannot bring a negligent training claim against the WVPSC Defendants in their individual capacity.   The WVPSC Defendants are, after all, essentially board members of a state agency, and they are not, in and of themselves, employers.   It is axiomatic that direct negligence claims are levied against *employers*, not other employees or commissioners.   Also, the Court is unaware of, and Plaintiffs have not identified, any law supporting their reed-thin theory that the WVPSC Defendants owe them a duty to train WVPSC officers, such as Defendant McCown.   That flaw negates the first element of their claim.

Even if Plaintiffs were correct that the WVPSC Defendants owed them a duty to train Defendant McCown, their claim would still fail.   As for their failure-to-train-for-felony-stops theory, Plaintiffs have not mustered a scintilla of evidence showing that Defendant McCown was negligently trained.   Their lone shred of evidentiary support is their expert witness, who testified that the precise methods Defendant McCown used during the fatal stop were improper, which, according to the expert, proves that Defendant McCown was negligently trained.   (*See* ECF No. 126 at 4.)   The Court disagrees.   Assuming Defendant McCown acted negligently during the felony stop (a notion this Court has already rejected), this lone blunder would be insufficient to

show that he was negligently trained.   Indeed, Defendant McCown could have received first-class training but still acted negligently in the heat of the moment.

Left grasping at straws, Plaintiffs fall back on Judge Berger's *Fortune* opinion.   In *Fortune*, a City of Logan ("the City") police officer[14] allegedly battered a compliant suspect, so the battered suspect sued the City for, among other things, negligent training.   2021 WL 4554667, at *1.   At the summary judgment stage, the evidence in *Fortune* showed that the City had trained the defendant officer on "defensive tactics, boxing, and take-down methods," but there was no evidence that he was also trained to avoid using excessive force.   *Id.* at *4.   Judge Berger reviewed this evidence and denied summary judgment, concluding that a reasonable jury could infer the City was negligent in not training the officer on how to avoid using excessive force.   *Id.*

But here, unlike in *Fortune*, there is *no evidence* detailing *any* of Defendant McCown's training.   Plaintiffs have thus failed to produce a scintilla of evidence showing the shortcomings of Defendant McCown's training, and that necessarily dooms their claim.   Put differently, Plaintiffs have not provided any record evidence from which a reasonable jury could infer that, because Defendant McCown received training on one topic but not another, he was negligently trained.   The only way a jury could, consistent with this evidence, find that Defendant McCown was negligently trained would be through speculation and guestimations.   The law forbids that. *White*, 2013 WL 12108650, at *2.

Plaintiffs' assertion that Defendant McCown was improperly trained in interpreting criminal statutes warrants little discussion.   First, the Court again finds that the WVPSC Defendants owed Plaintiffs no duty to train Defendant McCown on this matter.   Second, and for

---

[14]   The defendant officer was also Tincher.

22

the reasons just stated, the Court again finds that there is no record evidence from which a reasonable jury could find that Defendant McCown was negligently trained.   Third and finally, even if the WVPSC Defendants did breach a duty owed, there was still no causation—Plaintiffs' own expert conceded that Defendant McCown played no role in arresting and charging Robert and Michelle.   This aspect of Plaintiffs' negligent training claim also fails as a matter of law, and the Court hereby **GRANTS** the WVPSC Defendants summary judgment on Count VII(b).

iii.      Negligent Supervision

That leaves Plaintiffs' negligent supervision claim.   Under West Virginia law, a plaintiff bringing a negligent supervision claim must show that "[a municipal defendant] failed to properly supervise [an employee officer] and, as a result, [the employee officer] proximately caused injury to the [plaintiff]."   *Fortune*, 2021 WL 4554667, at *3 (alterations in original) (quoting *Woods*, 712 F. Supp. 2d at 515).

Plaintiffs' claim here comes nowhere close to making this showing.   The Court first notes that Plaintiffs have once again sued the wrong people—the WVPSC Defendants cannot be held liable for this supposed negligence.   *Wood*, 712 F. Supp. 2d at 515 (explaining that employers are the potentially liable party for negligent supervision of an employee).   Putting that aside, Plaintiffs have not provided the Court with any explanation as to how this claim differs from their meritless negligent training claim.   However, even if this claim did differ in some way, the Plaintiffs have not provided any record evidence to show that Defendant McCown was negligently supervised— the jury would simply have to take their word for it.   Thus, the Court **GRANTS** summary judgment to the WVPSC Defendants on Count VII(d).

*IV.      CONCLUSION*

For the foregoing reasons, Defendant McCown's motion for summary judgment, (ECF No. 113), is **GRANTED** in part and **DENIED** in part, and the WVPSC Defendant's motion for summary judgment, (ECF No. 116), is **GRANTED**.   Plaintiffs' claims against the WVPSC Defendants are hereby **DISMISSED** with **PREJUDICE**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:       November 15, 2023

THOMAS E. JOHNSTON, CHIEF JUDGE